UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| PAMELA K. BREITER,<br><br>            Plaintiff,<br><br>     v.<br><br>JO ANNE BARNHART, Commissioner of Social Security,<br><br>            Defendant. | Case No.  C04-5853RJB<br><br>REPORT AND RECOMMENDATION<br><br>Noted for January 6, 2006 |

     This matter has been referred to Magistrate Judge J. Kelley Arnold pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR 4(a)(4) and as authorized by Mathews, secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  This matter has been fully briefed and the undersigned now submits the following report and recommendation.

FACTUAL AND PROCEDURAL BACKGROUND

     Plaintiff alleges disability since June 5, 1997, due to hepatitis C, depression, fatigue, and anxiety. Plaintiff's Opening Brief summarized her testimony and history as follows:

     Plaintiff testified that she was 46 years old, was 5' 5" tall, weighed 146 pounds, and that her weight fluctuated within a 25 pound range. Plaintiff stated that when she was receiving Interferon treatment, she lost 45 pounds within four months, Plaintiff indicated that she had a thyroid condition as well that affected her metabolism.

     Plaintiff reported that she had received Interferon treatments for 12 months, having suffered

REPORT AND RECOMMENDATION
Page - 1

fatigue in addition to a rapid weight loss and fatigue. Plaintiff described having flu-like symptoms every single day, that food made her sick, and that she had gone home from work crying. Plaintiff also noted that the Interferon treatments made her irritable and that it felt like a "rug being ripped out from underneath" her.

Plaintiff testified that it took doctors about two years to diagnose Hepatitis C, that at first she was diagnosed with mononucleosis, and that she had worked throughout that period until a biopsy was done at which time she had started Interferon treatments. Plaintiff stated that she continued to work for five months after initiating Interferon treatments until she could not work any longer. This was when she lost 45 pounds, could not sleep and could not eat. Plaintiff noted that her job had been stressful. Plaintiff indicated that her doctor advised her not to work. Plaintiff testified that she was a single mother trying to raise her son and finally could not work any longer. Plaintiff stated she received Interferon treatments for another seven months after she quit her job.

Plaintiff admitted that stopping work improved her somewhat but that there was no predictability as to how she felt. Plaintiff indicated that there were days when she could not get out of bed because she was so worn out. Plaintiff noted that she did not get any better.

Plaintiff testified that the Interferon treatments did not do the job they were supposed to do, that doctors wanted her to take other medication and perhaps try Interferon treatments again. Due to the severity of her depression, fatigue and weight loss, Dr. Sharma advised her that he did not feel it was the right thing to do. Plaintiff stated that Dr. Sharma was her treating physician for Hepatitis C. Plaintiff indicated that Dr. Sharma told her that her Interferon treatments had failed.

Plaintiff testified that she was on thyroid medication and took Effexor, an antidepressant, and Clonazapan, also an anti-depressant, when she became irritable. Plaintiff stated that she had been receiving treatment at Kitsap Mental Health since about 1997. Plaintiff admitted being spotty regarding keeping appointments. Plaintiff indicated that she lived quite far from Kitsap Mental Health and that there were a lot of times that she would just stay home "in a shell". Plaintiff testified that she attended most of her appointments with Dr. Bruce but that at times she felt like the appointments were not worth going to. Plaintiff stated that she used to have difficulties leaving her house. Plaintiff described herself as previously being a happy-go-lucky person but that she had stopped being that person as a result of her Hepatitis C and depression.

Plaintiff reported waking up a lot throughout the night. Plaintiff testified that there were days when she could get up and do a few things but that generally She was 'just totally exhausted", at times wearing herself out mentally on a good day. Plaintiff described having mood swings that affected her family, describing herself as "having no energy". Plaintiff stated that she did not care to cook, was not interested in cooking anymore, and that other people in the family did the cooking. Plaintiff indicated that she lived with her fiancé, 17 year old son, and her fiancé's 16 year old daughter. Plaintiff described her fiancé as doing a lot of his daughter's laundry and that her son did his own laundry.

Plaintiff testified that she had no interest in doing grocery shopping or cooking anymore, previously loving to bake cakes. Plaintiff stated that her fiancé took care of the checkbook. Plaintiff described being able to read only magazines but not comprehending. Plaintiff indicated that she previously enjoyed reading books but that she could no longer sit and concentrate, ending up re-reading what she had read.

Plaintiff testified that she was able to pick up her fiancé's daughter from school, that her son still needed rides home, and that at times she was able to drive without difficulty. Plaintiff stated that she was reliable about picking up her fiancé's daughter and her own son. Plaintiff described Carla as being her only friend. Plaintiff indicated that she no longer participated in

church or other groups. Plaintiff reported that she could not commit to anything and was not able to plan far ahead because she did not know how she was going to feel. Plaintiff testified that at times she was too exhausted and felt down and depressed, not wanting to do anything

Plaintiff described herself as being a strong person at one time but not anymore. Plaintiff stated that she used to love to garden and do yard work, that sometimes she still went to St. Vincent or took a walk with Carla to look at antique stores. Plaintiff indicated that Carla would call her but that she would not return Carla's phone calls. Plaintiff reported Carla would not get upset because she understood how Plaintiff felt.

Plaintiff testified that her energy level was not "very good". Plaintiff described having some energy only for "very short little periods of time", being unable to finish shopping in the mall. Plaintiff stated that she was better in the morning when she was able to get up and do "simple things" for a couple of hours. Plaintiff indicated that her anti-depressant medication helped some with memory. Plaintiff described having been on seven different anti-depressant medications but that she continued to get "distracted" and "mixed up". Plaintiff referred to herself as not being "very functional".

Plaintiff testified that there was no predictability as to what she would be able to do or for how long or when she would become too exhausted to do anything. Plaintiff described herself as getting irritable with people even in "a casual public contact". Plaintiff stated that her main problem was "tiredness", "fatigue", and "no predictability", Plaintiff also described confusion. Plaintiff indicated that she had intermittent diarrhea, not knowing when she had to go to the bathroom.

Plaintiff was questioned as to why she failed to show up for appointments on December 4, 2001, and in January, February, March and June 2002. Plaintiff stated that it was because of her "mental disability", that sometimes she became mixed up and sometimes she did not want to go outdoors. Plaintiff Indicated that she forgot a lot of appointments, also at times asking why she should "bother" going to her appointments. Plaintiff described her depression in addition to her forgetfulness as causing her to miss appointments.

Plaintiff testified that she was not able to stand in one place for very long, it being unpredictable how long she could be on her feet. Plaintiff stated that she was not any better currently at the time of her second hearing than she had been in 2002, conceding that her mood swings and depression were probably worse currently.

Plaintiff indicated that she had tried to work through her Hepatitis C in 1996 and 1997 which is when she started feeling weak, tired and was diagnosed with mononucleosis. Plaintiff reported that she did not feel she could take time off work then because she was a single mother. Plaintiff described going to her doctor for two years and had blood tests until she was finally diagnosed with Hepatitis C. Plaintiff testified that her current appetite was better now than it was when she was taking Interferon treatments but that mentally she was worse. Plaintiff stated that she felt like she was 'just spinning [her] wheels" and "not getting anywhere". Plaintiff described her mental condition since 1997 as being "up and down" without any "consistency", that it had worsened, and that there being times when she was doing better and periods when she was doing worse. Plaintiff indicated that during a 30 day month, she would feel pretty good maybe eight or nine days and really horrible for two or three weeks during which time she felt "unproductive".

Plaintiff testified that she still would try to push herself to get out of bed because she had to get her fiancé's daughter to school. Plaintiff stated that there were times when she just wanted to come home "to hide", having "absolute tiredness", not feeling like she wanted to get out and do anything or that she had anything to offer anymore.

REPORT AND RECOMMENDATION
Page - 3

1  Plaintiff's Opening Brief at 2-6.

2  Plaintiff filed an application for Title II Social Security disability benefits on August 19, 1997. Plaintiffs application was denied administratively and no further appeal was filed, Plaintiff re-filed an application for Title II benefits on July 15, 1999. Plaintiff's second application was denied initially, on reconsideration, and on April 24, 2001, following a hearing before Administrative Law Judge Arnold Battise (hereinafter ALJ Battise). Plaintiff filed a timely appeal to the Appeals Council requesting review of the unfavorable decision. The Appeals Council vacated ALJ Battise's decision and remanded the case for further proceedings. A subsequent hearing was held on November 13, 2003, and on January 21, 2004. Plaintiff was again denied benefits by ALJ Battise. Plaintiff appealed to the Appeals Council which declined review on October 25, 2004. Plaintiff filed a timely Complaint in Federal District Court.

Plaintiff argues the following issues: (i) the ALJ reopened plaintiff's 1997 application for social security benefits, (ii) the ALJ erred by improperly rejecting the medical opinions supporting disability, (iii) the ALJ erred in his credibility assessment of Plaintiff and lay witnesses; (iv) the ALJ erred in his RFC assessment; (v) the ALJ erred by relying on GRID rule 202.21 to deny benefits at step-five, and (vi) the errors made should be reversed and Plaintiff should be awarded benefits without further consideration by the administration.

After careful consideration of the Administrative Record and the parties' memoranda, this court agrees that the ALJ erred in his review of the medical evidence and opinions, specifically in regard to Plaintiff's nonexertional limitations, and thus, this court recommends that the Court REVERSE the Secretary's decision and remand the case with directions to the Commissioner to award plaintiff appropriate benefits.

## DISCUSSION

This Court must uphold the Secretary's decision if the ALJ applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992); Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10

REPORT AND RECOMMENDATION
Page - 4

(9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 525 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Secretary's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

In this matter, ALJ Battise found that Plaintiff met the insured status requirements for Title II benefits through December 31, 2002, and that Plaintiff had not worked since her alleged onset date of June 5,1997 (Findings No. 1, 2). He further found that Plaintiffs "severe" impairments included depression, anxiety and hepatitis C, but that the impairments did not meet or equal a Listing (Finding No. 4).

ALJ Battise reviewed Plaintiff's allegations regarding her limitations and concluded she was "not totally credible" (Finding No. 5), and he found Plaintiff retained the ability to lift or carry 20 pounds occasionally and 10 pounds frequently, stand or walk for six hours in an eight-hour day, sit for six hours in an eight-hour work day, and the ability to perform simple, repetitive tasks not involving frequent public contact. ALJ Battise concluded that that although Plaintiff could not perform the full range of light work, using GRID Rule 202.21 as a framework, there were a significant number of jobs in the national economy that Plaintiff could perform (Finding No. 12). Accordingly, ALJ Battise found that Plaintiff was not disabled at anytime through the date of her insured status.

The ALJ's decision is not consistent with the opinions and conclusions of several medical providers. Most significantly, the opinion of the medical expert, Dr. Asher, who was called by the ALJ to testify at the hearing, is directly contrary to the ALJ's conclusion. As the medical expert, Dr. Asher reviewed all the evidence of record through November 2003. Dr. Asher stated that it looked to him like Plaintiff was 'doing very poorly" and doing "no better than or possibly worse than [what] was conveyed by Dr. Bruce in [Ex.) 15F" 2 ¼ years previous in 2001. Dr. Asher reported that he concurred with Dr. Bruce's conclusion that Plaintiff had a major depressive disorder and an anxiety disorder. Dr. Asher indicated that Plaintiffs major depressive disorder was secondary in part to her Hepatitis C and possibly other things and that Plaintiffs anxiety disorder was also partly secondary to her medical condition. Dr. Asher opined that the diagnoses by Dr. Bruce still applied but that it would be good to have more current information.

Dr. Asher further commented that Plaintiff should be rated under Listing 12.04 for her major depressive disorder and Listing 12.06 for her anxiety disorder. Dr. Asher indicated that Plaintiffs activities of daily living were "moderately impaired", that Plaintiffs social functioning was "markedly impaired", that

1  Plaintiffs concentration, persistence and pace were "markedly impaired", and that Plaintiff experienced
2  continuing short decompensations or periods of extremely poor functioning equivalent to three or more
3  periods but not lasting for two weeks at a time. Dr. Asher opined that the level of Plaintiffs functional
4  limitations went back to at least Dr, Bruce's report in May 2001.  Dr. Asher acknowledged that Dr.
5  Sharma in Ex, 13F, p. 18 (Jr. 332). felt that Plaintiff was unable to work due to the side effects from
6  Interferon and that Dr. Sharma had noted during that period that Plaintiff was depressed.

7  The weight of the medical evidence regarding Plaintiff's mental impairments supports Dr. Asher's
8  analysis.  On September 28, 1999, and April 20, 2000, Dr. Robinson and Dr. Peterson in a PRTF for DDS
9  rated Plaintiffs depressive disorder under Listing 12.04 as involving "moderate" restrictions of activities of
10 daily living, "often" deficiencies of concentration, persistence or pace and one or two episodes of
11 decompensation in work or work-like settings (Ex. 11 F, p. 8; Jr. 309). Dr. Robinson and Dr. Peterson
12 noted that Plaintiff's depression involved anhedonia or pervasive lost of interest in almost all activities, a
13 sleep disturbance, decreased energy and difficulty concentrating or thinking (Ex. 11 F, p. 4; Jr. 305).

14 In a mental RFC assessment for DDS, Dr. Robinson and Dr. Peterson on September 28, 1999, and
15 April 20, 2000, rated Plaintiff as having a "moderate" limitation in the following categories (Ex. 12F, pp.
16 1-2; Tr. 311-12):

17      1.    The ability to understand and remember detailed instructions.
18      2.    The ability to carry Out detailed instructions.
19      3.    The ability to maintain attention and concentration for extended periods (the
20            approximately 2-hour segments between arrival and first break, lunch,
              second break, and departure.)
21      4.    The ability to complete a normal workday and workweek without
              interruptions from psychologically based symptoms and to perform at a
22            consistent pace without an unreasonable number and length of rest periods.

23 Dr. Robinson and Dr. Peterson found that Plaintiff could do a three-step task pertaining to the
24 mental capacity for basic work but that Plaintiffs ability to complete "complex or detailed tasks" or to learn
25 new complex or detailed tasks was impaired by Plaintiffs "depression and fatigue interference" (Ex. 12F, p.
26 3; Tr. 313). Dr. Robinson and Dr. Peterson opined that Plaintiff could sustain focus for two hours on
27 simple tasks but was impaired in her ability to focus for two hours for complex or detailed tasks. Dr.
28 Robinson and Dr. Peterson stated that Plaintiff had no mental impairment in her ability to be to work on

REPORT AND RECOMMENDATION
Page - 6

1 time or sustain a normal routine but would suffer from interference due to her depressive symptoms during
2 the workweek, having an "unusual need for rest periods and would miss days likely" (Ex. 12F, p. 3; Tr.
3 313).

4 Plaintiffs treating psychiatrist Dr. Bruce opined on June 29, 2000, that Plaintiffs limitations met
5 Listing 12.04 (Ex. 13F, p, 4; Tr. 318). Dr. Bruce found that Plaintiff suffered from a depressive syndrome
6 with multiple symptoms, being markedly limited in all four "8" Criteria (Ex. 13F, pp. 3-4; Tr. 317-18). Dr.
7 Bruce also found that Plaintiff had a "marked" limitation in her ability to perform activities within a
8 schedule, maintain regular attention, be punctual within customary tolerances, make simple work-related
9 decisions, complete a normal workday and workweek without interruptions from psychologically based
10 symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, ask
11 simple questions and request assistance and respond appropriately to changes in the work setting,
12 "marked" being defined as sufficiently severe to preclude performance (Ex. I 3F, pp. 5-6; Tr. 319-20).

13 On May 17, 2001, Dr. Bruce noted that she had treated Plaintiff since February 1999, Dr. Bruce
14 finding that Plaintiff suffered from a major depressive disorder and an anxiety disorder NOS (Ex, 1SF, pp.
15 1-2; Tr. 485-86). Dr, Bruce opined that Plaintiff suffered a "marked" limitation in the ability to learn new
16 tasks, perform routine tasks, interact appropriately in public contacts, control physical or motor
17 movements and maintain appropriate behavior (Ex. 15F, p. 3: Tr. 487), "marked" being defined as a "very
18 significant interference with basic work-related activities" (Ex. 15F, p. 1; Tr. 485). Dr. Bruce stated that
19 Plaintiff suffered a "severe" limitation in her ability to exercise judgment, make decisions, relate
20 appropriately to co-workers and supervisors and respond appropriately to and tolerate the pressures and
21 expectations of a normal work setting (Ex. 1SF, p. 3; Tr. 487), "severe" being defined as an "inability to
22 perform one or more basic work-related activities" (Ex, 15F, p. 1; Tr. 485). Dr. Bruce noted that sedation
23 might be a side effect of Plaintiffs medication and that Plaintiff was helped by her son a lot (Ex. 1 SF, p. 3;
24 Tr. 487). Dr. Bruce stated that Plaintiff had difficulty making it to scheduled appointments, Dr. Bruce
25 indicating that Plaintiff was "very forgetful, easily confused" (Ex~ 1SF, p, 4; Tr. 488).

26 The ALJ did not properly address the medical opinions discussed above.   The ALJ is entitled to
27 resolve conflicts in the medical evidence. Sprague v. Bowen, 812 F.2d 1226, 1230 (9th Cir. 1987). He may
28 not, however, substitute his own opinion for that of qualified medical experts. Walden v. Schweiker, 672

F.2d 835, 839 (1 1th Cir. 1982). If a treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for doing so. Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983). "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." Lester v. Chater, 81 F.3d 821,831 (9thCir. 1996). It is unclear which medical opinion the ALJ relied on in this matter. While discredting Dr. Bruce's conclusions, the ALJ did assign "substantial weight to the treatment notes of Dr. Bruce, " when evaluating Plaintiff's residual capacity. The ALJ states that he assigns "some weight" to the opinion of Dr. Chalstrom, particularly the GAF rating of 60, reflecting moderate metnal impairments. The ALJ also indicates he assigns "greater weight" to the opinion of Dr. Hoskin's. On review, the court finds the ALJ improperly picked and chose certain aspects of some of the medical opinions of record to assign his own medical opinion consistent with his own view. The ALJ has not provided specific and legitimate reasons supported by the record to reject the medical evidence discussed above clearly supporting disability.

## CONCLUSION

Based on the foregoing discussion,.the Court should set aside and REVERSE the commissioner's decision and REMAND the case to the administration with directions to award appropriate disability benefits. Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit imposed by Rule 72(b), the clerk is directed to set the matter for consideration on **January 6, 2006**, as noted in the caption.

DATED this 15th day of December, 2005.

> */s/ J. Kelley Arnold*
> J. Kelley Arnold
> U.S. Magistrate Judge